UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| VANESSA COLEMAN,            )<br>                             )<br>        Plaintiff,          )<br>                             )<br>     v.                      )<br>                             )<br>DISTRICT OF COLUMBIA, *et al.*, )<br>                             )<br>        Defendants.         )<br>                             ) | | 09-cv-50 (RCL) |

**MEMORANDUM OPINION**

**I.      INTRODUCTION**

This action was filed by plaintiff Vanessa Coleman asserting, *inter alia*, a claim under 28 U.S.C. § 1983 for violations of her First, Fourth, and Fifth Amendment rights and also a common law claim for negligent hiring, training, and supervision. Defendant District of Columbia has moved for partial judgment on the pleadings on these claims. For the reasons contained in this Memorandum Opinion, this Court GRANTS defendant's motion for partial judgment on the pleadings.

**II.     BACKGROUND**

Vanessa Coleman was employed by the District of Columbia Fire and Emergency Medical Services Department ("FEMS") as a Captain at the time of her termination. Third. Am. Compl. ¶6 ("Complaint"). On March 12, 2008, Coleman and her truck company responded to the scene of a fire at a Mt. Pleasant apartment building. *Id.* ¶13. A few weeks after the fire, Battalion Chief John Lee cited Coleman for failing to report the conditions in the basement of the

building. *Id.* ¶16. Coleman challenged this citation before a different Battalion chief, Robert Kane, who increased her penalty from a written citation to a 24 hour suspension. *Id.* ¶18.

Coleman then began a lengthy campaign to clear her record, many details of which are not relevant for the purposes of this motion. ¶¶17-53. During this time, Assistant Chief Brian Lee ordered Coleman to complete a fitness for duty examination, an examination which included a psychological evaluation. Coleman refused to complete the psychological examination. On January 13, 2009, FEMS notified Coleman of proposed disciplinary action for insubordination based on her failure to complete the examination as ordered on three occasions. *See* Defs.' Opp'n to Pl.'s Mot. for Leave to File a Second Am. Compl. Ex. A at 1. The notice further stated that a trial would take place before a FEMS Fire Trial Board ("Trial Board"). *Id.*

In July 2009, the hearing before the Trial Board concluded and on September 1, 2009, Dennis Rubin, Chief of FEMS, issued a Trial Board Final Letter of Decision. *See* Defs.' Opp'n Ex. B. In his decision letter, Chief Rubin notified Coleman that the Trial Board had found her guilty of two of the three charges of insubordination and that he was adopting the Trial Board's recommendation that she be demoted to the rank of Sergeant. *Id.* at 1. Chief Rubin also adopted the recommendation that Coleman submit to a full fitness for duty evaluation, including a psychological examination, by October 1, 2009. *Id.* Chief Rubin informed her that "[f]ailure to complete the fitness for duty tests will result in termination, as recommended by the Fire Trial Board." *Id.* After Coleman did not attend her October 1, 2009 fitness for duty examination, Chief Rubin terminated Coleman's employment with FEMS. Compl. ¶67.

### III. ANALYSIS

A motion for judgment on the pleadings is permitted after the pleadings are closed, "but early enough not to delay trial." Fed. R. Civ P. 12(c). The analysis of this motion is essentially

equivalent to a motion to dismiss under Rule 12(b)(6) for failure to state a claim. *Cloonan v. Holder*, 768 F. Supp. 2d 154, 160 (D.D.C. 2011). Therefore, judgment on the pleadings is appropriate when a complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To overcome this hurdle, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted). The Court must "accept as true all of the factual allegations contained in the complaint," *Atherton v. District of Columbia*, 567 F.3d 672, 681 (D.C. Cir. 2009), and grant a plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). However, the Court may not "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Id.* In other words, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009); *see also Atherton*, 567 F.3d at 681 (holding that a complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

    A.       **28 U.S.C. § 1983 Claim**

To state a claim for a § 1983 violation, Coleman must allege both "a violation of [her] rights under the Constitution or federal law" and "that the municipality's custom or policy caused the violations." *Warren v. Dist. of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004). Coleman contends that defendants violated her rights under the First, Fourth, and Fifth Amendments to the Constitution. Because this Court finds that Coleman did not properly allege the "custom or

policy" requirement, this Court need not determine whether Coleman sufficiently plead a violation of her constitutional rights.

Coleman "bears the burden of pleading the existence of a municipal custom or practice. . . ." *Bonaccorsy v. Dist. of Columbia*, 685 F. Supp. 2d 18, 27 (D.D.C. 2010). Coleman must allege an "'affirmative link,' such that a municipal policy was the 'moving force' behind the constitutional violation." *Baker v. Dist. of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citations omitted). Coleman may demonstrate such a municipal policy based on: (1) "the explicit setting of a policy by the government that violates the Constitution," (2) "the action of a policy maker within the government," (3) "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom,'" or (4) "the failure of the government to respond to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Id*. This Court addresses each of these in turn.

**1. Explicit Setting of a Policy in Violation of the Constitution**

Coleman first argues that a discriminatory municipal custom or practice exists based on "the explicit setting of a policy by the [District] that violates the Constitution." *Id.* The District of Columbia can be liable under section 1983 when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 690 (1978). "[E]ven a single decision by such a body unquestionably constitutes an act of official government policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

Coleman contends that she has properly alleged an explicit policy because her complaint "sets out the facts and circumstances of other FEMS employees who suffered acts of retaliation

and constitutional violations similar to that which the Plaintiff experienced." Pl. Opp'n to Mot. 25. Coleman's complaint, however, has nothing to do with whether an "explicit" policy, practice, or ordinance exists. Coleman's complaint contains facts relevant to whether FEMS has acted in a similar manner toward other employees. Such facts may be relevant to the last three of the four *Baker* tests, but they are irrelevant to whether the District has set an "explicit" policy that violates the Constitution. *Baker*, 326 F.3d at 1306. Coleman's complaint never identifies which "officially adopted" ordinance or decision of the D.C. City Council—or FEMS—*explicitly* set a policy in violation of the Constitution.

### 2. Action of a Policymaker Within the Government

Coleman's second argument is that a discriminatory municipal custom or practice exists based on "the action of a policy maker within the government." *Id.* Coleman makes allegations that two FEMS officials acted as the final municipal policy maker—FEMS Chief Dennis Rubin and Assistant Chief Brian Lee.

Assistant Chief Lee is the easiest to dismiss. Plaintiff cites no case where an "assistant" has been held to be a final policy maker. In fact, examples from prior cases demonstrate that a final decision maker typically must be at least an agency head or the governing body of an agency. *See Banks v. Dist. of Columbia*, 377 F. Supp 2d 85, 91 (D.D.C. 2005) (holding the Director of the District of Columbia Department of Mental Health to be a final policy maker with authority under D.C. Code § 7-1131.05); *Singletary v. District of Columbia*, 685 F. Supp. 2d 81, 90-91 (D.D.C. 2010) (holding the District of Columbia Board of Parole to be a final policy maker). Therefore, Assistant Chief Lee cannot be a policy maker for the purposes of imputing municipal liability to the District of Columbia.

The question is closer with respect to FEMS Chief Dennis Rubin. In *Byrd v. District of Columbia*, 2011 WL 3583243 (D.D.C. Aug. 16, 2011), this Court held that the Director of the District of Columbia Department of Parks and Recreation was not a final policy maker because "[no] portion of the D.C. Code specifically grante[ed] authority to the DPR director to promulgate administrative rules or anti-harassment policies and procedures . . . ." *Id.* at *29. This Court reasoned that an official is not a policy maker "[i]f an official's discretionary decisions are constrained by policies not of that official's making." *Id.*

D.C. Code § 5-402(a) specifically grants the Mayor of the District of Columbia certain authorities with respect to FEMS. The Mayor is authorized to

> appoint, assign to such duty or duties as he may prescribe, promote, reduce, fine, suspend, with or without pay, and remove all officers and members of the Fire Department of the District of Columbia, according to such rules and regulations as the Council of the District of Columbia, in its exclusive jurisdiction and judgment (except as herein otherwise provided), may from time to time make, alter, or amend; provided, that the rules and regulations of the Fire Department heretofore promulgated are hereby ratified (except as herein otherwise provided) and shall remain in force until changed by said Council . . . .

*Id.* This case is similar to *Byrd* because the D.C. Code gives no specific grant of authority to the Fire Chief to set final policy. *See also Triplett v. Dist. of Columbia*, 108 F.3d 1450, 1451 (D.C. Cir. 1997) (holding the Director of the District of Columbia Department of Corrections not to be a final decision maker). Indeed, the Mayor and the City Council have expressly reserved supervisory powers to themselves. Coleman responds that Rubin is "a member of the executive branch with significant decision-making authority." Def. Mot. Op. [94] 30. This Court has no doubt that the Fire Chief possesses significant decision-making authority with respect to the fire department—but that is different than being the *final* policy maker, which is required before section 1983 liability may attach.

6

Further, this Court has already refused permit Coleman to sue Chief Rubin in his personal capacity and held that Chief Rubin in no way exceeded the Trial Board's recommendations by discharging Coleman. Mem. Op. [35] 4. The Trial Board explicitly provided that "[f]ailure to complete any aspect of the examination will be grounds for immediate termination, and not the overall recommended demotion to the rank of Sergeant." Def. Exh. B [33-3] 9. To the extent that Chief Rubin was required to follow the recommendation of the Trial Board and unable to increase the penalty recommended by a Trial Board, Chief Rubin was again constrained in his exercise of discretion and, therefore, not a final policy maker.

### 3. Custom

Coleman next argues that she has sufficiently alleged that the District of Columbia has adopted, "through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom.'" *Baker*, 326 F.3d at 1306. This must be "a persistent, pervasive practice of the city officials . . ., which although not officially adopted, was so common and settled as to be considered a custom or policy." *Carter,* 795 F.2d 116, 125 (1986) (quotations omitted). Coleman alleges that the FEMS consistently engages in three practices that violate her constitutional rights.

First, Coleman alleges that "[t]he established municipal policy/custom of disciplining FEMS employees based on Fitness for Duty examinations, administered in violation of the [] DCMR provisions, violated the Due Process rights of the Plaintiff . . . ." Compl. ¶104. As support, Coleman alleges that FEMS ordered Sonya Lesane to undergo a similar Fitness for Duty examination, including a psychological component, after she reported "difficulty lifting certain equipment due to a recurring on-the-job injury." *Id.* ¶74. FEMS then discharged Lesane in 2008

7

after a psychologist found her not fit for duty, but Lesane was later reinstated when an arbitrator ruled in her favor. ¶¶77-79.

Besides Coleman's conclusory allegation that FEMS has an "established policy" of due process violations, Coleman's only factual support for the existence of this policy is the Lesane example. Lesane, however, seems to have received some form of due process because she was reinstated to her job after an appeal through the union grievance system. ¶79. Further, Coleman never alleges which aspects of due process were violated in Lesane's situation and any comparison between her case and Coleman's case is not readily apparent. While no hard and fast rule exists for the number of examples Coleman would need to plead in order for this Court to find it plausible that FEMS undertook a consistent policy of due process violations, the Court is confident that one example coupled with a conclusory allegation is insufficient to meet the plausibility standard.

Second, Coleman alleges that "[t]he established municipal policy of requiring employees to submit to a Fitness for Duty psychological exam[] under direct orders and without clear voluntary consent . . . violated the 4th Amendment right to be free from unreasonable searches and seizure . . . ." Compl. ¶105. As support, Coleman again relies only on allegations that Lesane was ordered to sign a voluntary consent form prior to undergoing a psychological examination. *Id.* Again, the Court finds that the Lesane example is not sufficient standing on its own to plausibly allege that a custom of Fourth Amendment violations exists.

Third, Coleman alleges that "[t]he established municipal custom of disciplining FEMS employees for protected free speech . . . violates the First Amendment." Compl. ¶115. Coleman alleges that FEMS employees Chris Sullivan, Gregory Bowyer and Gerald Pennington suffered similar violations of their First Amendment rights. Coleman alleges that a Fire Trial Board

8

convicted Chris Sullivan in 2009 of five charges related to testimony given at a D.C. Council Hearing, including "using loud, threatening or abusive language . . . with the intent to impede, disrupt, or disturb [the D.C. Council Hearing]." ¶¶69-73. Sullivan had intended on raising concerns about the FEMS disciplinary process with the D.C. Council. ¶70. Gregory Bowyer and Gerald Pennington allegedly suffered retaliation for raising concerns with city officials that unqualified firefighters had been assigned to conduct and lead fire investigations. ¶80. Bowyer and Pennington also argued that these unqualified firefighters were promoted based on a racially discriminatory policy. *Id.*

These examples have little in common with Coleman's allegedly protected speech regarding "fraud, waste of public monies, abuse of authority, and mismanagement by FEMS officials and employees." Compl. ¶112. Further, these three individuals involve only two distinct events over three years, 2007-2009. Coleman makes no allegation that even some, most, or all FEMS members making "protected" speech experience unlawful deprivations of their first amendment rights. *See Pineda v. City of Houston*, 291 F.3d 325, 329 ("Eleven incidents each ultimately offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces."). Coleman's allegations simply cannot be said to plausibly state the required "persistent, pervasive practice" on the part of the District of Columbia. *Carter,* 795 F.2d at 125. In light of Coleman's mishmash of factual allegations, Coleman has not plausibly alleged actions "so consistent that they have become 'custom.'" *Baker*, 326 F.3d at 1306.

### 4. Deliberate Indifference

Coleman finally argues that she has sufficiently alleged that the District of Columbia failed "to respond to a need (for example, training of employees) in such a manner as to show

'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Baker*, 326 F.3d at 1306. Coleman is not required to plead that the District subjectively knew about the overdetention problem: the question is whether "the [District] knew or should have known of the risk of constitutional violations, an objective standard." *Id.* at 1307. Deliberate indifference means that "faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of *inaction*." *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004) (emphasis added).

Coleman cites to 70 of the 116 paragraphs contained in her Third Amended Complaint and argues that these paragraphs contain the allegations relevant to her deliberate indifference theory. Pl. Op. 34. While such a throwaway citation may have seemed useful at the time it was drafted, citing over 60% of the Third Amended Complaint does nothing to point this Court to the specific facts supporting Coleman's deliberate indifference theory.

From what the Court can discern after its own review of these paragraphs, Coleman alleges that the D.C. City Council and the Mayor's Office "were notified by the community organization E.R.A.S.E. Racism of suspected racism in FEMS." Compl. ¶19. She also alleges that she "sent correspondence to Mayor Fenty, members of the D.C. City Council and Chief Rubin disclosing her concerns about the retaliation and abuses she faced at FEMS." *Id.* ¶21. Notably, Coleman never alleges that she informed the D.C. City Council or the Mayor of First Amendment, Fourth Amendment, or any other constitutional violations. Additionally, Coleman's pleadings relating to Sonya Lesane, Chris Sullivan, Gregory Bowyer or Gerald Pennington fail to allege that they informed the D.C. City Council of the risk of constitutional violations. For example, Bowyer and Pennington raised concerns to the D.C. City Council about

unqualified fire inspectors conducting fire investigations. This is far different from Coleman informing the D.C. City Council that FEMS suppresses its employees' constitutional rights.

Additionally, Coleman never pleads *inaction* on the part of the D.C. City Council and the Mayor's office, even if they had "knowledge that [their] agents will probably violate constitutional rights." *Warren*, 353 F.3d at 39. At a minimum, Coleman must plead that the District failed to act in the face of these alleged constitutional violations. This Coleman did not do. Being "negligent in their hiring, training, and supervision of the managers," Compl. ¶92, is different than "adopt[ing] a policy of inaction," 353 F.3d at 39. In light of this, Coleman has not properly alleged deliberate indifference as a basis for section 1983 liability.

### B. Negligent Hiring, Training, and Supervision

Defendant also moves for judgment on the pleadings on Coleman's common law claim for negligent hiring, training, and supervision. To properly allege a claim for negligent hiring, training, and supervision, Coleman's claim must be based on a violation of duties that were "independently actionable under the common law" prior to the enactment of a codifying statute. *Griffin v. Acacia Life Ins. Co.,* 925 A.2d 577, 576 (D.C. 2007). Here, Coleman argues that she has plead sufficient facts to support an underlying claim of the common law tort of wrongful discharge in violation of public policy.

As a general rule, District of Columbia law has long recognized the at-will employment doctrine, which states that "an employer may discharge an at-will employee at any time and for any reason, or for no reason at all." *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C. 1991) (citing *Wemhoff v. Investors Mgmt. Corp.*, 528 A.2d 1205, 1208 n. 3 (D.C. 1987)); *Taylor v. Greenway Restaurant, Inc.*, 173 A.2d 211 (D.C. 1961); *Pfeffer v. Ernst*, 82 A.2d 763, 764 (D.C. 1951)). In *Adams*, however, the D.C. Court of Appeals recognized an intentional tort for

wrongful discharge, holding that "there is a very narrow exception to the at-will doctrine under which a discharged at-will employee may sue his or her former employer for wrongful discharge when the sole reason for the discharge is the employee's refusal to violate the law, as expressed in a statute or municipal regulation." 597 A.2d at 34. The plaintiff in Adams was a truck driver who was fired after he refused to drive a truck that did not have an inspection sticker on its windshield, which would have been illegal under municipal regulations. Id. at 29–30 & n. 1 (citing 18 DCMR § 602.4 (1987)). In recognizing the "very narrow exception" to the at-will doctrine, the *Adams* court reasoned:

> Adams was forced to choose between violating the regulation and keeping his job—the very choice which . . . he should not have been required to make. Even though the criminal liability facing him was not very great, it was nonetheless unacceptable and unlawful for his employer to compel him to choose between breaking the law and keeping his job.

Id. at 34.

In this case, Coleman was not discharged for refusing to violate a law. Coleman was discharged for refusing to undergo a psychological examination. If Coleman had agreed to the psychological examination, no law would have been broken. Therefore, on its face the *Adams* exception to the employment at-will doctrine does not apply.

Coleman contends, however, that *Carl v. Children's Hospital*, 702 A.2d 159, 160 (D.C. 1997), expanded the wrongful discharge exception created in *Adams*. In *Carl*, the at-will employee, a nurse, alleged *inter alia*, that she was wrongfully discharged in retaliation for testifying before the Council of the District of Columbia on proposed tort reform legislation, taking a position that advocated patients' rights adverse to the interests of her employer. *Id.* at 160. Her employer claimed that she was fired for failing to meet orientation requirements for probationary employees. *See id.* D.C. Code § 1-224 makes it unlawful to intimidate or impede a

witness in any proceeding before the D.C. Council. A plurality of the D.C. Court of Appeals read this provision "as a declaration of policy by the Council seeking to ensure the availability of information essential to its legislative function by imposing criminal penalties on anyone who seeks to impede Council access to such information." *Id.* at 165. The court concluded that there was an adequately "close fit" between that public policy and the plaintiff's termination because termination of employment is "the most severe and most effective" way for an employer to affect an employee's testimony before the Council. *Id.* Therefore, the *Carl* court held that the public policy embodied in § 1-224 warranted expansion of the *Adams* exception to the at-will employment doctrine.

After *Carl*, this Court, the D.C. Court of Appeals, and the D.C. Circuit have created additional exceptions to the supposedly "very narrow" public policy exception. *See Myers v. Alutiiq Intern. Solutions, LLC*, 2011 WL 4018230 at *5 (D.D.C. Sept. 12, 2011) (Jackson, J.) ("reporting wrongdoing in connection with government contracting falls within the public policy exception to an at-will employment relationship"); *Ware v. Nicklin Assocs., Inc.*, 580 F. Supp. 2d 158, 165-66 (2008) (Walton, J.); *Riggs v. Home Builders Institute*, 203 F. Supp. 2d 1, 21 (D.D.C. 2002) (Hogan, J.) ("the policy of protecting against abuse of the public treasury by utilizing its funds for partisan activity is a sufficiently clear mandate of public policy for the purposes of *Carl*"); *Washington v. Guest Servs., Inc.*, 718 A.2d 1071, 1080-81 (D.C. 1998) ("[c]onduct that imperils the health and safety of the elderly residents of a retirement home, who, as a group, are particularly vulnerable to the kind of practice here alleged, is obviously contrary to the public policy of this jurisdiction."); *Liberatore v. Melville Corp.*, 168 F.3d 1326, 1331 (D.C. Cir. 1999) ("threat to report conditions to the FDA that were in violation of federal and District of Columbia laws protecting the public from the purchase of adulterated drugs implicates the kind of public

policy embodied in a statute or regulation underlying the D.C. Court of Appeals' decision in *Carl*").

While it appears that the public policy exceptions may be "swallow[ing] up the at-will doctrine"—as feared by Justice Terry in his *Carl* concurrence—it is the duty of this court to apply D.C. law as it has been interpreted by both the D.C. Circuit and the D.C. Court of Appeals. *See Carl*, 702 A.2d at 162 (Terry, J., concurring).  Applying the principles from *Carl* and its progeny, this Court must analyze whether Coleman has sufficiently plead a violation of a public policy "firmly anchored either in the Constitution or in a statute or regulation which clearly reflects the particular policy being relied upon." *Id.*  Coleman contends that she has plead "violations of public policy clearly stated in the D.C. Personnel Regulations, the First Amendment, and in D.C. Code § 1-301.43 . . . ." Def. Opp'n 36.

First, Coleman alleges that the District of Columbia has violated public policy "clearly stated" in the D.C. Personnel Regulations, specifically 6 DCMR § 2049.  Compl. ¶¶33-37.  This section "establish[es] the requirements for pre-employment and other physical examinations, including fitness-for-duty examinations." § 2049.1.  However, § 2049.4(b) provides that "[t]o the extent inconsistent with any applicable law or regulation, the provisions of this section shall not apply to . . . Firefighters in the [FEMS]."  Whatever public policy is evidenced by § 2049.1, it is equally evident that the FEMS retains a special exception from this policy.  Therefore, this is not the kind of regulation evidencing a "clear mandate of public policy." *Riggs,* 203 F. Supp. 2d at 21.

Second, Coleman argues that the First Amendment clearly states a public policy that the District of Columbia violated by her termination.  Again, Coleman fails to identify what policy she is talking about.  Coleman's generalized assertion that some policy supported by the First

14

Amendment has been violated is evidence itself of the insufficiency of her pleadings. While Coleman may identify the Constitutional provision relied on—the First Amendment—Coleman never "clearly" identifies what public policy "firmly anchored" in the First Amendment she relies on—as *Carl* requires. *Carl*, 702 A.2d at 162. It is not the duty of this Court to formulate plaintiff's arguments for her or to scour the Complaint and consider all possible public policies implicated by the First Amendment—especially in light of the "very narrow" exception to the at-will employment doctrine at issue here. *See U.S. ex rel. El-Amin v. George Washington University*, 533 F. Supp. 2d 12, 19-20 (D.D.C. 2008) (Kollar-Kotelly, J.).

Third, Coleman argues that D.C. Code § 1-301.43 (formerly § 1-224) clearly states a public policy that the District violated. As previously discussed, this section makes it unlawful to intimidate or impede a witness in any proceeding before the D.C. City Council, and *Carl* held that the public policy of encouraging candor before the Council warranted expansion of the *Adams* exception to the at-will employment doctrine. However, § 1-301.43 explicitly applies to only "any witness in any proceeding pending before the Council . . . or investigation being had by the Council . . . ." Here, Coleman does not allege that she was a witness in a proceeding or a participant in a D.C. City Council investigation. This is not a case, like *Carl*, where Coleman was dismissed as a result of testimony given to the D.C. City Council. Coleman never pleads that the D.C. City Council has taken any interest in her case at all. Therefore, Coleman again fails to state a "clear mandate of public policy" that has been violated by her termination.

Because Coleman has not alleged sufficient facts to state a plausible claim for the underlying tort of wrongful termination, Coleman cannot state a claim for negligent hiring, training, and supervision. Therefore, defendant's motion for judgment on the pleadings on this claim must be GRANTED.

A separate Order consistent with this opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on December 7, 2011.