**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| VANESSA COLEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 09-cv-50/11-cv-1322 (RCL) |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION**

## I.     INTRODUCTION

This action was filed by plaintiff Vanessa Coleman asserting claims against the District of Columbia, the chief of D.C.'s Fire and Emergency Medical Services (FEMS), Dennis Rubin in his official capacity, and the Assistant Fire Chief (AFC) Brian Lee in his individual capacity under 28 U.S.C. § 1983 for violations of her First, Fourth, and Fifth Amendment rights, and a common law claim for negligent hiring, training, and supervision. Docket No. 09-cv-50. Coleman subsequently filed an additional action naming only the District of Columbia as a defendant and asserting claims under Title VII of the Civil Rights Act of 1964 (Title VII) and D.C. Human Rights Act (D.C. HRA) for retaliation and hostile workplace. Docket No. 11-cv-1322. Several of plaintiff's initial claims were dismissed by this court in a December 7, 2011 Order granting defendant's motion for partial judgment on the pleadings, and the two cases were subsequently consolidated. [99, 100]. Now pending before this court is defendants' motion for summary judgment on all of plaintiff's remaining claims. For the reasons contained in this Memorandum Opinion, this Court GRANTS defendant's motion for summary judgment.

II.     **BACKGROUND**

    A.  **The Mount Pleasant Fire**

Plaintiff, an African-American female, was a captain in FEMS[1] on March 12, 2008 when a fire broke out in a high-rise apartment building in the Mt. Pleasant neighborhood of Washington, D.C. See Pl. Br. at 2. The fire was one of the "largest in the Department's recent history, and drew a great deal of attention and criticism from the public." Pl. Br. at 3. The fire was apparently not adequately controlled by FEMS, and led to a total loss of the building as well as damage to a neighboring church. Pl. Br. at 2-3.

An internal FEMS dispute over plaintiff's role at the scene of the fire triggered the main events leading to this litigation. Plaintiff claims that upon arrival at the scene, she began a check of the basement as required by the department's standard operating guidelines before being interrupted by the operations commander at the scene, Battalion Fire Chief (BFC) John Lee, who diverted her away from the basement and towards the third floor. Pl. Br. at 2-3. Later, an investigation revealed that FEMS' failure to check the basement first had been fatal to the department's efforts to control the fire, which had in fact begun in the basement. Pl. Br. at 2; Defs. Br. at 4.

In the months following the fire, FEMS began investigating the failure. Plaintiff filed a series of memoranda to superiors, providing her side of the story, contesting her innocence of misconduct, explaining that John Lee's tactical error had caused the failure to control the fire, and requesting a formal investigation into the events. Pl. Br. at 3-4; Pl. Ex. 8, 11, 12; Defs. Ex. A-07, A-13, A-14. Plaintiff also aired some of these grievances publicly, through a "personal journal" posted on a blog, and a phone interview that aired on a radio station. Pl. Ex. 95 at 2.

---

[1] As a captain in FEMS, plaintiff "commanded a company with significant safety [related] duties" to firefighters and the public. Defs. Br. at 2 (citing Defs. Ex. K, D.C. FEMS Rules and Regulations, Article II).

On April 17, BFC John Lee cited the plaintiff for violating Article VII, Section 2 of the D.C. Fire and EMS Order Book for violating the Standard Operating Guide and "fail[ing] to ensure that the basement check was completed." Defs. Br. at 4; Defs. Ex. A-07; Pl. Ex. 8; <u>see also</u> Pl. Br. at 4. BFC Schaeffer offered to settle the charge against plaintiff with a written reprimand, but plaintiff declined this offer, and challenged the charges. Pl. Br. at 4; Defs. Br. at 4.

On April 25, BFC John Lee, whom plaintiff insists was responsible for the department's failure to control the Mount Pleasant fire, also received notice of an infraction for failing to "follow up with . . . [plaintiff's Engine Company] regarding the lack of a basement report . . .". Defs. Br. at 5; Defs. Ex. J. Like plaintiff, Lee was offered a settlement of an official reprimand. Defs. Br. at 5. Unlike plaintiff, however, he accepted the settlement. Defs. Br. at 5.

On May 19, plaintiff's challenge was heard by BFC James Kane. Pl. Br. at 4. On May 30, Kane found plaintiff guilty and recommended a 24-hour suspension. Defs. Br. at 4; Pl. Br. at 4.

Plaintiff reacted to all this by filing a series of memoranda and appeals in June and July contesting her innocence, complaining that the hearing before Kane was procedurally defective, and seeking reversal. Pl. Br. at 4-5; Pl. Ex. 23, 45, p. 12, 29, 30, 42; Defs. Ex. A-29, A-37, A-41. Several of these memos contained unusual language. In one, plaintiff purported to cite a superior,[2] claiming that he "ha[d] orchestrated a behavior of mutiny" and referred to a "conspiracy against her." Defs. Br. at 7 (citing Defs. Ex. A-33). Another complained that a "pursuit to diabolically cripple [her] professional career"  had "become the primary agenda of [her] chief officials." Defs. Br. at 7 (citing Defs. Ex. A-25, A-26, A-28). The volume of these memoranda peaked when plaintiff filed six memoranda directed to a single officer (Chief Rubin) in the course of the single day – behavior which plaintiff acknowledges "a supervisor could

---

[2] Defendants assert that plaintiff did not have authority to cite superiors. Defs. Br. at 6.

perhaps find . . . out of the ordinary." Pl. Br. at 29. On July 28, Fire Chief Rubin affirmed Kane's decision and the 24-hour suspension as penalty. Pl. Br. at 5; Pl. Ex. 42, pp. 28-30.

**B.  Fitness For Duty Evaluation, Insubordination, and Termination**

On July 25, defendant and assistant chief Brian Lee ordered plaintiff to undergo a fitness for duty evaluation at the Police and Firefighters Clinic (PFC), with both psychological and physical components. Pl. Br. at 9; Pl. Ex. 44, 77. At her July 31 appointment, plaintiff declined to sign the waiver form requesting to speak first with counsel. Pl. Br. at 9. The Coordinator of Behavioral Health Services at PFC, Dr. Jacqueline Jackson, initially decided to place plaintiff on limited duty pending completion of her evaluation. However, Dr. Jackson apparently conferred with several officials, including defendant Lee, and then informed plaintiff that she would be placed on sick leave. Pl. Br. at 9; Defs. Ex. N.

Next, BFC Begley told plaintiff that she would be charged with insubordination for disobeying the order to undergo the fitness for duty evaluation. Pl. Br. at 9-10. Plaintiff submitted a memorandum to Chief Rubin defending her actions in disobeying the order, alleging that the order was retaliatory. Pl. Br. at 10; Pl. Ex. 31; Defs. Ex. A-42. Begley endorsed the memorandum, and charged plaintiff with insubordination. Pl. Br. at 10; Pl. Ex. 47.

On August 7, plaintiff returned for a rescheduled appointment to undergo the psychological component of her fitness for duty evaluation. This time, she signed the waiver form only after making alterations to it, and noting that she was submitting to the evaluation "under duress and under the threat of further retaliation or adverse personnel action." Pl. Br. at 10; Pl. Ex. 48. The attending psychologist informed plaintiff that PFC legal counsel would have to review the modified form before the evaluation was conducted, and sent plaintiff away. Pl. Br. at 10.

Later that month, plaintiff and her counsel met with defendant Lee and FEMS deputy general counsel, Thelma Chichester, to discuss the outstanding order to complete a fitness for duty evaluation and plaintiff's pending claims of discrimination. Pl. Br. at 10. The meeting resulted in an agreement, formalized in a September 3, 2008 memorandum by Ms. Chichester, that allowed plaintiff to return to work, referred plaintiff's complaints about racial and sex discrimination in FEMS to an outside EEO investigator, and promised to hold in abeyance both the order for plaintiff to undergo evaluation as well as any accompanying administrative action resulting from plaintiff's failure to comply with this order, pending resolution of plaintiff's EEO claims. Pl. Br. at 10.[3]

The EEO investigation concluded with no action in late October. Pl. Br. at 15. Plaintiff began the process of filing a formal complaint with the D.C. Office of Human Rights on November 13. Defs. Br. at 11 (citing Pl. Ex. 73).

After the EEO investigation of plaintiff's complaints was concluded, plaintiff's obligations to complete the fitness for duty evaluation were no longer held in abeyance, and on November 20, plaintiff was informed that she was scheduled for a psychological evaluation on November 26. Pl. Br. at 11. On the morning of the appointment, plaintiff filed a complaint in D.C. Superior Court, seeking to enjoin defendants from compelling her to submit to a fitness for duty evaluation, and called the PFC to inform them she would not be able to appear for her appointment. Pl. Br. at 11.

On January 13, 2009 defendant Lee issued formal charges of insubordination against the plaintiff for challenging the order that she submit to a fitness for duty evaluation. Pl. Br. at 12.

---

[3] Plaintiff claims that, notwithstanding this agreement, she was notified on September 9 that she was being charged with insubordination for refusing to complete the fitness for duty evaluation on August 7, 2008, though there is no indication in plaintiff's filings that this was pursued and, in any case, it is not material here. Pl. Br. at 11 (citing Defs. Ex. F, p. 47).

In February, with charges pending, plaintiff was again ordered to report to the PFC for an evaluation. Pl. Br. at 12. On February 11, plaintiff attended the PFC appointment, signed the waiver without alteration, completed the written exam portion of her psychological evaluation. Pl. Br. at 12-13. Plaintiff returned on February 18 to complete the oral interview portion of the psychological evaluation, during which she informed the attending doctor, Dr. Morote, that she was at PFC under duress. Pl. Br. at 13. After hearing this statement, Morote stopped the interview, and requested that plaintiff submit a written statement clarifying her reasons for appearing at PFC. Pl. Br. at 13. On February 24, plaintiff submitted a statement in which she asserted that she was being forced to undergo an evaluation "in retaliation for raising concerns about a number of important issues within the department." Pl. Br. at 13 (quoting Pl. Ex. 34). Dr. Morote later wrote that she would be "unable to proceed" with the evaluation in light of plaintiff's written statement. Pl. Br. at 14 (quoting Pl. Ex. 71).

On March 11, plaintiff was further charged with insubordination for failing to complete the February 18 fitness for duty evaluation. Pl. Br. at 13.

In June and July 2009, a FEMS Trial Board was held concerning the charges of insubordination. The Trial Board concluded that plaintiff was guilty of insubordination for failing to complete the fitness for duty evaluations as ordered on July 31, 2008, and November 26, 2008. Pl. Br. at 43. The panel recommended that plaintiff be demoted two ranks, to Sergeant, and ordered (again) to submit to a fitness for duty evaluation or face termination. Pl. Br. at 15 (citing Pl. Ex. 88, pp. 171-72).

On June 26, 2009, plaintiff reported again to PFC for a psychological exam, where she was informed she would be terminated unless she stated that she was taking the psychological evaluation voluntarily. She refused to do so. Pl. Br. at 15.

In August, 2009, plaintiff was informed of yet another appointment for the psychological exam. Pl. Br. at 16. On August 25, 2009, plaintiff did not attend the appointment, and instead filed a motion for a temporary restraining order, seeking to enjoin the defendants from forcing her to take the evaluation. Pl. Br. at 16.

In September, plaintiff was notified that she had until October 1 to complete the exam or face termination. Plaintiff declined to do so, and on October 7, she was terminated. Pl. Br. at 17.

### C.  Other Alleged Protected Activities and Retaliatory Actions

Over this same period, plaintiff also composed and filed a number of other memoranda, complaints, and letters.

On January 19, 2007, plaintiff submitted a memorandum addressed to then interim Fire Chief Brian Lee reporting a FEMS paramedic providing substandard care. Pl. Br. at 5; Pl. Ex. 2; Defs. Ex. A-03.

In early 2007, plaintiff sent a letter to then D.C. Council-Chairman Vincent Gray and Mayor Adrian Fenty, complaining that FEMS engaged in race- and sex-based discrimination. Pl. Br. at 5; Pl. Ex. 1; Defs. Ex. A-01.[4] Plaintiff forwarded a copy of this letter to FEMS Diversity and EEO Program coordinator Detria Liles-Hutchinson. Pl. Br. at 5; Pl. Ex. 52.

In March 2007, plaintiff sent a letter to an EEO investigator complaining that her reassignments to and out of the fire prevention division at FEMS were made because of her race and sex. Pl. Br. at 5; Pl. Ex. 4. In August, she filed an intake questionnaire with the EEOC alleging the same, and plaintiff continued to provide additional information to an EEOC investigator regarding these allegations. Pl. Br. at 6.

---

[4] Defendants urge the Court to ignore this, and other communications invoked by plaintiff for the first time in her opposition to defendant's motion for summary judgment, having failed to raise these issues in her responses to defendant's discovery requests. See Defs. Reply at 5-7. However, even if these communications are properly before the Court, plaintiff's claims still fail.

Throughout 2008, plaintiff maintained a blog describing the race- and sex-based discrimination and harassment she had experienced and witnessed at FEMS.

On March 31, 2008, plaintiff submitted a memorandum to several superior officers, detailing an incident in which her radio transmissions were ignored. Pl. Br. at 3.

In April, 2008, plaintiff filed a grievance with her Union complaining about being forced to attend an EEO training class, and attributing this order to her race and sex and in retaliation for her previous orders. Pl. Br. at 6-7. She also filed a memorandum complaining of this order to attend the EEO training to Chief Rubin. Pl. Br. at 7.

In May, 2008, plaintiff filed a memorandum complaining that several previous reports placing disciplinary charges on subordinates had not been properly and timely acted upon by her superiors. Pl. Br. at 6.

Also in May, plaintiff sent a memorandum to Chief Rubin, complaining of an incident involving a firefighter violating the grooming policy, and her thwarted efforts to punish him. Pl. Br. at 7. In June, plaintiff was reprimanded for failing to enforce the grooming policy. Pl. Br. at 45.

In June, plaintiff sent numerous memoranda to Chief Rubin purporting to charge her superior officers with failing to timely process disciplinary charges she had filed against subordinates. Pl. Br. at 7. Plaintiff also sent other memoranda to Chief Rubin – complaining about being forced to take her unit out of service while she worked on her report about the Mount Pleasant incident, and also about the discipline incident regarding the firefighter who violated the grooming policy. Pl. Br. at 7.

Also in June, plaintiff sent letters to D.C. Councilmembers, the Mayor, and Chief Rubin complaining that FEMS officials were retaliating against her for speaking out. Pl. Br. at 7

Still in June, plaintiff filed yet more memoranda to Chief Rubin complaining about superiors' failure to timely process her disciplinary charges, alleging racial discrimination as the cause of this failure. Pl. Br. at 8.

And, in June, plaintiff claims that defendants removed her ability to obtain case reference numbers necessary for tracking her disciplinary matters. Pl. Br. at 50; Pl. Ex. 33; Defs. Ex. A-48.

In July, plaintiff wrote another memorandum to Chief Rubin alleging that her superiors were selectively disciplining Black firefighters, but declining to support her efforts to discipline her own subordinates. Pl. Br. at 8.

On July 2, 2008, plaintiff alleges that her ability to cite superior officers was removed. Pl. Br. at 50.

On July 8, 2008, plaintiff was detailed from Engine Company 21 to the Facilities Maintenance Division of FEMS, where she was assigned "to count and catalogue chairs." Pl. Br. at 8.

On July 13, 2008, plaintiff was detailed to the facilities maintenance division away from her company. Pl. Br. at 50.

On July 21, 2008, plaintiff was ordered to attend EEO training. Pl. Br. at 50.

In February 2009, plaintiff filed charges with the D.C. Office of Human Rights and EEOC, disparate treatment, and retaliation. Pl. Br. at 8-9; Pl. Ex. 33; Defs. Ex. A-48.[5]

**D.  Summary**

For purposes of analysis, these events are best broken into substantive categories. Plaintiff's statements, filings, complaints, and letters may be broken down into the following seven categories:

---

[5] Defendants also review a long series of EEO/FEMS Diversity Office allegations and complaints against plaintiff by fellow employees from 2007 through 2008 which the Court does not summarize here. Defs. Br. 8-12.

(1) internal (FEMS) communications regarding the Mount Pleasant fire;

(2) internal communications protesting the fitness for duty evaluation and EEO training;

(3) internal communications complaining about incompetence, procedural violations, or poor performance of subordinate or superior officers;

(4) internal communications regarding race and sex-discrimination;

(5) legal action to enjoin the fitness for duty evaluation;

(6) legal and administrative filings, including judicial, EOC, and D.C. Office of Human Rights alleging discrimination;

(7) external statements regarding race and sex discrimination at FEMS.

The adverse employment actions taken by defendants against plaintiff can be broken into the following thirteen events:

(1) citation for failing to check basement at Mt. Pleasant fire (April 2008);

(2) offer of formal rebuke as settlement (April/May 2008);

(3) 24 hour suspension (May 2008);

(4) reprimand for failing to enforce grooming policy (June 2008);

(5) removal of access to case reference numbers necessary for tracking disciplinary matters (June 2008);

(6) order to attend EEO training (July 2008);

(7) removal of ability to cite superior officers (July 2008);

(8) order to undergo fitness for duty evaluation (July 2008);

(9) placement on sick leave pending completing of the evaluation (July 2008);

(10) detail from engine company to the facilities maintenance division (July 2008);

(11) charge of insubordination (January 2009);

(12) conviction of insubordination and demotion of two ranks (June/July 2009);

(13) employment termination (October 2009).

## III.   ANALYSIS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's evidence as true. Anderson, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. Id. at 252.

### A.  § 1983 First Amendment Claim Against AFC Brian Lee

Plaintiff claims that defendant Brian Lee violated her First Amendment rights by taking adverse employment actions against her in retaliation for several allegedly First-Amendment protected activities. For reasons discussed below, plaintiff has failed to make a showing sufficient to establish this claim, and so the court grants defendants' motion for summary judgment.[6]

---

[6] Because the court rules that Mr. Lee committed no constitutional violation against plaintiff, it does not address defendant's alternative argument that Lee is entitled to qualified immunity because any violation he committed was not clearly established at the time.

On December 7, 2011, this court issued an order granting defendant's motion for partial judgment on the pleadings. [99] The order provided that "plaintiff's claims under 28 U.S.C. 1983 and plaintiff's claim for negligent hiring training, and supervision are hereby dismissed." Id. However, the memorandum opinion issued along with the order only addressed plaintiff's § 1983 claims against the District of Columbia and fire chief Dennis Rubin in his official capacity, and not plaintiff's claims against Assistant Chief Brian Lee in his individual capacity. Thus, plaintiff's § 1983 claims against Brian Lee in his individual capacity were not dismissed. These § 1983 claims were fully briefed by both parties here, and are now ripe for this court's review.

In her Third Amended Complaint, plaintiff alleged also violations of her First, Fourth and Fifth Amendment rights as part of her § 1983 claims. Here, plaintiff has not argued the Fourth and Fifth Amendment claims with respect to Mr. Lee, and so these claims will be considered abandoned.

### 1.   Plaintiff's Allegations Against Brian Lee

Plaintiff alleges that Lee had direct knowledge of six allegedly protected First Amendment activities taken by the plaintiff. For analytical clarity, each activity is matched with one of the substantive categories articulated above:

(i)     internal complaint about a defective paramedic (Jan. 19, 2007), Pl. Br. at 5, 24-26; Pl. Ex. 2.  Category 3.

(ii)    letter to the city council alleging discrimination in FEMS "kicked back" to Lee as interim chief, Pl. Br. at 45; Pl. Ex. 88 at 21. Category 7.

(iii)   assorted complaints against superior officers in mid-2008, Pl. Br. at 45; Pl. Ex. 85 at 71-91. Category 3.

(iv)     appeal from the 24 hour suspension (June 23, 2008), Pl. Br. at 4, Pl. Ex. 45, 12-
15. Category 1.

(v)      e-mail and memorandum listing previous complaints (July 16, 2008), Pl. Br. at 8;
Pl. Ex. 77, and attaching two previously-filed memoranda: (a) allegation that one
of her superiors was involved in a "conspiracy" to "invent a situational catalyst so
that cause can be found to allege inefficiency of [plaintiff's] command." Pl. Ex.
77 at 3; and (b) response to charges brought against plaintiff by the EEO, in which
plaintiff wrote: "if a man is facing execution, at a certain time and at a certain
place, it is his civic right to be explained the charge for which he is being
executed for. It's too late to remit explanation after the man is dead-- having
already been executed." Pl. Ex. 77 at 6. Category 3.

(vi)     Notice of TRO legal action against FEMS in Nov. 26, 2008. Pl. Br. at 11-12. Pl.
Ex. 61, 62. Category 2.

In sum, plaintiff has specifically alleged that Lee was aware of statements and filings that fall
under Categories 1, 2, 3, and 7.

Plaintiff asks this court to hold Lee more broadly accountable, seeking to attribute to Lee
knowledge of plaintiff's allegedly protected activities plaintiff beyond those which plaintiff has
specifically alleged were communicated to him and within his knowledge. However, this court
has already dismissed the § 1983 claims brought against the city of Washington D.C., as well as
against the fire chief in his official capacity, [99] and will not allow plaintiff to nullify this
court's previous order by attributing all acts and events that occurred over this period to Mr. Lee
without more than conclusory allegations to the contrary. It will here only consider those

statements for which plaintiff has provided the court a reason to believe that Mr. Lee was aware of those statements.

Regarding the allegedly retaliatory actions taken, plaintiff specifically alleges that Lee "was directly involved in the actions taken against plaintiff that led to her termination, including the decisions to order plaintiff to submit to psychological testing and to charge her with insubordination." Pl. Br. at 2. Plaintiff claims that Lee was involved in the following three allegedly retaliatory actions:

(1) Lee issued the "request to order" plaintiff to undergo a fitness for duty evaluation (July 25, 2008), Pl. Br. at 9; Pl. Ex. 44;

(2) Lee was in part responsible for having plaintiff placed on sick leave, instead of merely limited duty, following her initial refusal to sign the waiver (after July 31, 2008), Pl. Br. at 9; Defs. Ex. N;

(3) Lee issued the charge of insubordination (Jan. 13, 2009), Pl. Br. at 12, 27, Pl. Ex. 49.

Plaintiff also urges this court to hold Lee responsible for allegedly retaliatory decisions and acts made by other FEMS officials against plaintiff, Pl's Br. at 2 (asserting that Lee, as assistant chief, "had significant authority over personnel decisions."); Pl. Br. at 14 (asserting that at the time of her June and July 2009 Trial Board hearing, "Defendant Lee, as the AFC of Planning and Policy, was in charge of the Office of Compliance, the FEMS division responsible for the composition, function and powers of the Fire Trial board proceedings"). However, for similar reasons as given above, Lee will only be held responsible for those acts which plaintiff has specifically alleged he was responsible – not for the acts of the whole agency.

To restate plaintiff's claim: Mr. Lee violated plaintiff's First Amendment rights where, because of plaintiff's statements falling under categories 1, 2, 3, and 7, defendant ordered a

fitness for duty evaluation, placed plaintiff on sick leave pending the evaluation, and charged her with insubordination for refusing to undergo the evaluation.

### 2.  Legal Standard

"The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." Garcetti v. Ceballos, 547 U.S. 410, 419 (2006). This circuit has adopted a four-part test to evaluate a public employee's First Amendment retaliation cause of action against his or her public employer:

> First, the public employee must have spoken as a citizen on a matter of public concern. Second, the court must consider whether the governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in commenting upon matters of public concern. Third, the employee must show that her speech was a substantial or motivating factor in prompting the retaliatory or punitive act. Finally, the employee must refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech.

LeFande v. Dist. of Columbia, 613 F.3d 1155, 1158-59 (D.C. Cir. 2010) (quoting Wilburn v. Robinson, 480 F.3d 1140, 1149 (D.C. Cir. 2007)). "The first two factors  . . . are questions of law for the court to resolve, while the latter are questions of fact ordinarily for the jury." Tao v. Freeh, 27 F.3d 635, 639 (D.C. Cir. 1994).

### 3.  Analysis

#### i.  Most of Plaintiff's Statements Are Not Matters of Public Concern

To succeed on her First Amendment retaliation claim, plaintiff must first show that she spoke as a citizen on a matter of public concern. If the subject matter of the speech is not public concern, "it is unnecessary ... to scrutinize the reasons for [the] discharge." Connick v. Myers, 461 U.S. 138, 146 (1983). The Court of Appeals has described the boundaries of "public concern" as follows:

Speech by public employees may be characterized as not of "public concern" when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies. On the other hand, speech that concerns "issues about which information is needed or appropriate to enable members of society" to make informed decisions about the operation of their government merits the highest degree of first amendment protection.

LeFande, 613 F.3d at 1159 (quoting Hall, 856 F.2d at 259).

Allegations that government employees or supervisors are behaving incompetently or inappropriately are not matters of public concern. See Connick, 461 U.S. at 148 (the "confidence and trust" the district attorney's staff members had in their supervisors was not of public concern, nor was "the level of office morale," nor "the need for a grievance committee"); Murray, 741 F.2d at 438 (the FBI practice of furloughing agents by lottery was not of public concern, but rather the "quintessential employee beef" that management has acted incompetently); Barnes v. Small, 840 F.2d 972, 982 (D.C. Cir. 1988) (alleged assaults and false statements within the Army's Military Traffic Management Command were not public concern but "addressed only the misbehavior of other employees in [the] office"). The Supreme Court and the D.C. Circuit have noted some issues that are of "public concern." See, e.g., Pickering, 391 U.S. at 569 (how to operate the school system); Connick, 461 U.S. at 149 (whether assistant district attorneys feel pressured to work in political campaigns); Lafande, 613 F.3d at 1161 (procedural irregularities in the police department's reserve corps program); Hall, 856 F.2d at 259 (structure of academic and athletic programs at a public university); O'Donnell v. Barry, 148 F.3d 1126, 1133-34 (D.C. Cir. 1998) (police department's enforcement priorities and police chief's fitness for office). And, the D.C. Circuit has held that a "statement concerning racial discrimination on the part of a public agency is a matter of public concern because it involves

information that enables members of society to make informed decisions about the operation of their government." Tao, 27 F.3d at 640 (internal quotations omitted).

Under these principles, most of plaintiff's statements are not of "public concern," and thus are not actionable under a First Amendment retaliation claim. LeFande, 613 F.3d at 1158-59. Plaintiff's internal memoranda complaining of the department's management and attribution of blame for the Mount Pleasant fire (Category 1) is the kind of grievance that, while significant to her own career and future in the department, "would be of no relevance to the public's evaluation of the performance of governmental agencies." See LeFande, 613 F.3d at 1159. Similarly, plaintiff's internal memoranda protesting the imposition of the fitness for duty evaluation (Category 2) is a purely internal FEMS dispute, not of public concern but is merely the "quintessential employee beef," that her manager has acted incompetently or unfairly in her case. Murray, 741 F.3d at 438. And, the same is true of plaintiff's numerous complaints about inferior and superior officer's incompetence (Category 3), which "address[] only the misbehavior of other employees in [the] office," not any matter of public concern. Barnes, 840 F.2d at 982.

In contrast, plaintiff's external statements alleging discrimination at FEMS (Category 7) are matters of public concern. Tao, 27 F.3d at 640. While this court is sensitive to defendant's concern that mere "bald speculation" of racial discrimination should not transform "an otherwise departmental matter into a public one," Defs. Br. at 21, it finds that plaintiff has surpassed this relatively low standard with respect to her claims of racial discrimination here – enough to survive summary judgment on this element of her claim.

**ii. Plaintiff Has Failed To Show That Her Protected Speech Was a Substantial or Motivating Factor in Prompting Lee's Allegedly Retaliatory or Punitive Act**

Now that plaintiff's First Amendment actionable communications have been whittled down to just her public allegations of discrimination at FEMS, for the sake of brevity, the Court skips over the second element of her First Amendment retaliation claim (interest balancing) and proceeds to the third element to evaluate whether plaintiff has made a sufficient showing that this protected statement was a "substantial or motivating factor" underlying the any of the allegedly retaliatory employment actions taken by defendant Brian Lee.[7] See O'Donnell, 148 F.3d at 1133. Although causation is often a question for the jury, to survive a motion for summary judgment a plaintiff must show that there is "evidence (either of a direct or indirect nature) from which a reasonable jury could find the required causal link between the protected disclosures . . . and the allegedly retaliatory actions." Williams v. Johnson, 701 F. Supp. 2d 1, 17 (D.D.C. 2010). A nonmoving party must establish more than "the mere existence of a scintilla of evidence" in support of its position to survive summary judgment. Anderson, 477 U.S. at 252.

Here, plaintiff has failed to satisfy this burden with respect to any of the three allegedly retaliatory actions taken by defendant Lee.

Regarding Lee's July 25, 2008 order that plaintiff undergo a fitness for duty evaluation, plaintiff alleges only that Lee was aware of her public statements and communications regarding discrimination at FEMS. As defendants point out, this claim is itself very weak at best, as Lee claims that he was not aware of these statements until November 2008 at the earliest, Defs. Br. at 29, well after the alleged July 25, 2008 retaliation.  Moreover, defendant correctly asserts that several of the purportedly retaliation-triggering communications were made in early 2007 – a very long time before the earliest retaliatory conduct. See Defs. Reply at 8. And, plaintiff does not provide any direct evidence that any of these communications prompted Lee's activities. But,

---

[7] Note, as explained above, the court only considers the three adverse actions directly tied to defendant Lee, a subset of the thirteen adverse actions alleged by plaintiff.

even if Lee was timely aware of some of these communications, and even if the time-lag was not too long, plaintiff's claim would fail because it is undermined by over-inclusive pleading and briefing, which unintentionally lends credibility and support to her opponent's argument. By urging the court that Lee acted because of plaintiff's multitudinous filings and communications – of which the protected amounts to just a small fraction – plaintiff unintentionally concedes the legitimacy of defendant's own explanation for his actions: that it was a legitimate response to plaintiff's "barrage" of filings, as a manifestation of "bizarre" and worrisome behavior. See Defs. Reply at 9; see also, e.g., Watson v. City of Miami Beach, 177 F.3d 932 (11th Cir. 1999) (holding public agency's interest in ensuring employees were fit for duty as a legitimate reason for personnel actions); Coffman v. Indianapolis Fire Dep't, 619 F. Supp. 2d 582 (S.D. Ind. 2009).

　　In other words, plaintiff and defendants actually agree to a large degree about the major cause of Lee's decision to order the fitness for duty evaluation: plaintiff's voluminous and aggressive written complaints filed within FEMS complaining about the performance of superior and inferior officers. Pl. Br. at 46; Defs. Br. at 26. These communications are notable not merely because of their volume (as many as six memoranda in a single day to a single supervisor), but also because of their contents – they contain references to "conspiracies" in the workplace against plaintiff, and warn of "irreversible peril," "mutiny" and make use of other such paranoid and extreme language. See Defs. Br. at 7. But most of these concededly triggering activities are not issues of public concern and thus, not First Amendment protected. Thus, plaintiff has conceded that Lee's ordering the fitness for duty test was a response to a an unusual or in plaintiff's own words "out of the ordinary," Pl. Br. at 29, barrage filings and other statements, the majority of which is non-protected activity. Because plaintiff has failed to offer any evidence tying this action specifically to the narrow subset of her filings that qualify as protected speech,

she is unable to meet her burden of showing more than a "scintilla" of evidence that the protected activity was a "substantial or motivating factor" for the order. See Anderson, 477 U.S. at 252.

And, plaintiff's allegations regarding the remaining two allegedly retaliatory actions taken by defendant Lee (placing her on sick leave, and charging her with insubordination) also fail. These actions were issued as collateral consequences of plaintiff's decision to refuse to comply with the initial order to undergo fitness for duty evaluation. These further acts may be found prohibited only if plaintiff succeeded in showing that the initial order to undergo this evaluation was an illegal retaliatory act, or if she offered some additional specific evidence tying these actions to the protected speech. Plaintiff has failed to show that her protected speech was a "substantial or motivating factor" in those subsequent decisions.

For those reasons, the court grants defendant's motion for summary judgment on plaintiff's First Amendment claim against defendant Lee.

## B.  D.C. Whistleblower Protection Act Claim

Plaintiff also claims in her initial, 09-cv-50 Complaint, that defendants violated the D.C. Whistleblower Protection Act (WPA) by taking numerous adverse personnel actions against her in retaliation for many protected disclosures. D.C. Code §§ 1-615.51 *et seq*. For reasons discussed below, the Court also grants defendants' motion for summary judgment on these claims.

### 1.  Retroactivity of the DC WPA and Plaintiff's Claim Against Defendant Lee

The 2009 amendments to the WPA (WPAA) took effect in early 2010, after all of the alleged activities took place here, and do not apply retroactively to this case. Statutory references here are to the applicable 2006 iteration of the DC-WPA.

The 2009 amendment added language authorizing suits against supervisors in their individual capacity. Accordingly, defendant urges the court to dismiss plaintiff's WPA claim against defendant Lee, who is named in his individual capacity in this suit, arguing that the previous iteration of the WPA, which is applicable to this case, did not authorize suits against individual supervisors. Defs. Br. at 33-34. Plaintiff does not address this argument. However, even if plaintiff's claim against Lee is not barred under the statute, plaintiff's claims against all defendants fail on the merits.

### 2. Legal Standard

The D.C. WPA protects government employees from taking adverse personnel actions against an employee in retaliation for certain protected disclosures. D.C. Code § 1-615.53. The statute defines "protected disclosure" as:

> any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that the employee reasonably believes evidences: (A) Gross mismanagement; (B) Gross misuse or waste of public resources or funds; (C) Abuse of authority in connection with the administration of a public program or the execution of a public contract; (D) A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or (E) A substantial and specific danger to the public health and safety.

§ 1-615.52(6).  The statute does not define "reasonable belief" but the D.C. Court of Appeals has adopted the following definition: whether a "disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude that the actions of the government evidence" any of the circumstances listed in the above code section. Zirkle v. Dist. Of Columbia, 830 A.2d 1250, 1259-60 (D.C. 2003); see also Williams v. Johnson, 2012 WL 2508964, at *3 (D.D.C. July 2, 2012).

Plaintiff claims that her various communications are protected disclosures because they reveal information that falls under three of the statutory categories: (A) gross mismanagement;

(D) violations of a federal and local laws and agency rules; and (E) A substantial and specific danger to the public health and safety.

While the D.C. WPA itself does not define the term "gross mismanagement," the D.C. Court of Appeals has recognized that the federal whistleblower protection statute, 5 U.S.C. § 2302(b)(8), is instructive in interpreting the D.C. WPA. Wilburn v. District of Columbia, 957 A.2d 921, 925 (D.C. 2008) (citing Crawford v. Dist. of Columbia, 891 A.2d 216, 221 n.12 (D.C. 2006)). From interpretations of the federal statute, the D.C. Court of Appeals derived a definition of "gross mismanagement" in the D.C. WPA: "For there to be a protected disclosure, 'an employee must disclose such serious errors by the agency that a conclusion the agency erred is not debatable among reasonable people.'" Wilburn, 957 A.2d at 925 (quoting White v. Dep't of the Air Force, 391 F.3d 1377, 1382 (Fed. Cir. 2004)). Further, as used in the federal whistleblower statute, the term "gross mismanagement" means "a management action or inaction which creates a substantial risk of significant adverse impact upon the agency's ability to accomplish its mission." Kavanagh v. Merit Sys. Protection Bd., 176 Fed. Appx. 133, 135 (Fed. Cir. 2006). "Mere differences of opinion between an employee and his agency superiors as to the proper approach to a particular problem or the most appropriate course of action do not rise to the level of gross mismanagement." White, 391 F.3d at 1381. Moreover, "where a dispute is in the nature of a policy dispute, 'gross mismanagement' requires that a claimed agency error in the adoption of, or continued adherence to, a policy be a matter that is not debatable among reasonable people." Id. at 1383.

As for disclosures of violations, the D.C. WPA, by its own language, restricts the protection of disclosures which reveal violations of laws or rules to those not "of a merely technical or minimal nature."  D.C. Code § 1-615.52(6)(E).  Under the WPA, protection is

granted to one who exposes actions which objectively harm the public, not "the rigid partisan whose beliefs and conduct were being challenged by his superiors." <u>Zirkle</u>, 830 A.2d at 1260.

Finally, the phrase "danger to the public health and safety" is also used in the federal WPA, and has been interpreted by federal courts. The Federal Circuit stated "the inquiry into whether a disclosed danger is sufficiently 'substantial and specific' to warrant protection under the WPA is guided by several factors, among these: (1) 'the likelihood of harm resulting from the danger;' (2) 'when the alleged harm may occur;' and (3) 'the nature of the harm,' i.e., 'the potential consequences.'" <u>Chambers v. Dep't of the Interior</u>, 602 F.3d 1370, 1376 (Fed. Cir. 2010). Further,  success requires identifying a "substantial and specific harm" that has either "already been realized" or is "likely to result in the reasonably foreseeable future." <u>Id</u>. Accordingly, when a plaintiff has met her burden the communications have "concerned specific allegations or evidence either of actual past harm or of detailed circumstances giving rise to a likelihood of impending harm." <u>Id</u>.

In order to state a prima facie case, plaintiff must show that the "protected disclosure" which he or she reasonably believed would disclose one of the afore-mentioned governmental problems, was a "contributing factor" behind the adverse personnel action. <u>See Crawford</u>, 891 A.2d at 221. The code defines "contributing factor" as "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." D.C. Code § 1-615.52(a)(2).

WPA claims are analyzed under the same burden shifting analytical paradigm established for federal discrimination cases. <u>Johnson v. Dist. of Columbia</u>, 935 A.2d 1113 (D.C. 2007); <u>Crawford</u>, 891 A.2d at 221. The plaintiff carries the initial burden of establishing a prima facie case of retaliation. <u>Johnson</u>, 935 A.2d at 1118. The burden then shifts to the defendant to show

"by clear and convincing evidence that the [adverse employment act] would have occurred for

'legitimate, independent reasons' even if [plaintiff] had not engaged in activities protected under

the act. <u>Crawford</u>, 891 A.3d at 218. If the defendant can articulate such a reason for the action,

plaintiff then bears the burden of proving that the explanation for the action is a pretext. <u>Id</u>.

According to the D.C. Court of Appeals, the statute "shields an employee only to the extent the

record supports a finding that he would not have been disciplined <u>except for</u> his status as a

whistleblower." <u>Johnson</u>, 935 A.2d at 1119 (quoting <u>Crawford</u>, 891 A.2d at 222). "Essentially,

then, liability under the Whistleblower Protection Act is measured under a 'but for' analysis." <u>Id</u>.

### 3.  Analysis

#### i.  Protected Disclosures

Many of plaintiff's statements, filings, and memoranda do not qualify as "protected

disclosures" under the WPA. Plaintiff refers to dozens of purportedly protected disclosures,

which this court has reduced, for analytical clarity, to the seven categories of communications

listed above.[8] Of these categories, only numbers (4), (6) and (7) are arguably "protected

disclosures" under the WPA.

Plaintiff's Category 1 filings are not protected disclosures. They concern plaintiff's own

career at FEMS. Even assuming <u>arguendo</u> the facts alleged by plaintiff about her true role at the

scene of the Mt. Pleasant fire are true, and that FEMS was mistaken to impose discipline her

filings and statements of protest would not be protected by the WPA. An erroneous citation of an

officer for a professional error does not rise to the level of "gross mismanagement" articulated

above. <u>See</u>  <u>Wilburn</u>, 957 A.2d at 925;  <u>see also</u> <u>White</u>, 391 F.3d at 1381; <u>Kavanagh</u>, 176 Fed.

---

[8] Again, the court assumes, without deciding, that all of these allegedly protected statements are properly before the court. In other words, the court does not address defendants' argument that many of these are in fact barred because they were not included in plaintiff's Third Amended Complaint, because plaintiff cannot provide adequate information about them, or because they occurred too long before any alleged retaliatory adverse employment action by defendants to support any inference of causation which plaintiff relies on in her prima facie case. Defs. Br. at 38-40.

Appx. at 135. While these filings allege violations of FEMS rules, these alleged violations are all of a "merely technical or minimal nature" – concerning the procedures for administering internal professional discipline -- and thus are not protected by the statute.  D.C. Code § 1-615.52(6)(E). Finally, these allegations do not disclose any "substantial and specific" risk to the public safety. See Chambers, 602 F.3d at 1376.

Plaintiff's Category 2 filings fail for the same reasons – they address issues that may be significant for plaintiff's own career at FEMS, but fail to disclose any "gross" mismanagement, any non-trivial rule violations, or any substantial and specific risk to the public safety.  The imposition of the fitness for duty examination certainly cover matters of great concern to her as an individual and possibly her future role in the department, but do not evidence any threat to public safety, gross mismanagement, or violations of law that would qualify as a "protected disclosure."

Plaintiff's Category 3 filings also fail. These filings raise violations of numerous agency policies and rules such as violation of grooming policy, inadequate processing of plaintiff's other filings, the administration of personnel discipline in the department, and inadequate care provided by a FEMS paramedic. Again. these are technical minor rule violations, not protected by the statute. The allegation of a single incident of a paramedic providing what plaintiff took to be inadequate care does not rise to the level of a "specific and substantial" threat to public safety. None of these filings are protected disclosures.

Plaintiff's Category 4 filings and statements alleged race and sex discrimination in FEMS, a violation of federal and local laws prohibiting discrimination, and therefore do qualify as "protected disclosure" under the WPA.

Plaintiff's Category 5 legal action to enjoin the fitness for duty evaluation is, for purposes of the D.C. WPA, identical to plaintiff's internal filings protesting the imposition of this evaluation, and thus not a protected disclosure.

Plaintiff's Category 6 legal and administrative filings contending discrimination are protected disclosures because they allege a violation of federal and local laws that are more than minimal.

Finally, plaintiff's Category 7 statements alleging discrimination are only protected insofar as they are made to a "public body" or a "supervisor." D.C. Code § 1-615.52(6). Thus, her letters to the City Council and the Mayor are protected; but her blog posts and public "journal" are not.

In summary, only communications that fall under categories (4), (6) and part of (7) are actionable as protected disclosures under the WPA.

### ii.     Defendants Have Legitimate Non-Retaliatory Reasons For Taking Adverse Actions And Plaintiff Cannot Show These To Be Pretextual

This court need not decide whether the plaintiff has met her initial burden to show these three categories of protected disclosures were a "substantial factor" in motivating defendants to take one or more of the nine adverse personnel actions taken above. Even assuming, arguendo, that she had met this burden, the defendants have shown an independent and legitimate reason for taking each of these actions against plaintiff. And plaintiff cannot rebut this reason by showing it to be a mere pretext.

In total, plaintiff complains of thirteen adverse employment actions, which are listed above.  For all of these actions, there is a legitimate non-retaliatory explanation which plaintiff has not and cannot show to be merely pretextual.

Defendants' actions (1) and (2) were part of the immediate aftermath of the Mt. Pleasant fire. Plaintiff correctly notes that defendants did not specifically allege an independent justification for taking these personnel actions against plaintiff in their motion for summary judgment. Pl. Br. at 44 n.5. However, defendants urge the court to reject these allegations because plaintiff raised them for the first time in her opposition, and failed to mention them during discovery when the question was put to her directly to "describe each instance of prohibited personnel action or act of retaliation." Defs. Reply at 15. However, even if these contested actions are properly before the court, plaintiff's claims will fail because there is an independent and non-retaliatory reason is apparent on the face of these actions and both parties' briefs: namely, that FEMS reprimanded plaintiff for making an error at the scene of the fire because they found that she actually made such an error. Plaintiff's efforts to trace this action to her protected speech founders on the fact that FEMS also reprimanded John Lee, the person plaintiff claims was responsible for the error that led to the loss of the building, the same way they reprimanded plaintiff. He too was cited for failing to "follow up with . . . [plaintiff's Engine Company] regarding the lack of a basement report . . .". Defs. Br. at 5; Defs. Ex. J. Like plaintiff, John Lee was offered a settlement of an official reprimand. Defs. Br. at 5. Unlike plaintiff, however, Mr. Lee accepted the settlement offer. Defs. Br. at 5. The same penalty doled out to two individuals for the same alleged incident is inconsistent with plaintiff's causal theory that she was being singled out for retaliatory treatment based on her prior speech activity.

Thus, defendants have impliedly offered a legitimate and independent reason – that these actions were taken against plaintiff not as retaliation for plaintiff's speech activities but because of plaintiff's perceived failure at the scene of the Mt. Pleasant Fire. Whether or not FEMS' perception of plaintiff's role at the scene of the fire, or plaintiff's version of the events is

the true and accurate account is of no moment: the only thing that matters for the sake of this argument is that at the time of the citation, FEMS' belief that plaintiff had failed to check the basement independently caused FEMS officials to make the challenged personnel actions against her. Plaintiff's only basis for challenging this reason as pretextual is her bare allegation that officers became aware of some of her earlier memoranda and filings shortly before taking the action. Pl. Br. at 44-45. Because plaintiff has failed to respond to defendant's point that FEMS issued the same penalty to John Lee, she has failed to rebut this legitimate and independent reason, and so defendants are entitled to summary judgment on her WPA claims with respect to these two adverse actions.

Similarly, defendants implicitly offer an legitimate reason for action (3): The elevation of the penalty was a response to plaintiff's decision to reject the initial settlement offer and contest the charges. Because plaintiff failed to show actions (1) and (2) were retaliatory, and because action (3) is connected to those previous actions, plaintiff must show something distinct about action (3) in order to survive Summary Judgment. She has not done so. Based on the same reasoning given for actions (1) and (2), plus plaintiff's further action (legitimately distinguishing her case from Lee's) refusal of the favorable settlement offered, defendants have an independent and non-retaliatory reason for issuing this suspension to plaintiff, and plaintiff has not rebutted this by showing it to be a mere pretext.

With respect to defendant's action (4) – reprimanding plaintiff for failing to enforce the grooming policy – plaintiff alleges that this was taken in retaliation for plaintiff's filings on the Mt. Pleasant fire, blog entries, and various memoranda filed to Chief Rubin. Pl. Br. at 45. Plaintiff is again correct to note that defendants have not specifically alleged an independent justification for this personnel action in their motion for summary judgment. See Pl. Br. at 45

n.6.  However, again, defendants raise the same objection with respect to this allegation as with allegations (1) and (2) – that this personnel action is not actionable because plaintiff waived it by failing to list it in her discovery responses. Defs. Reply at 15. Once again, however, even if the defendants' argument was rejected and this reprimand were actionable under WPA, plaintiff's claims would still fail.

The first possible justification of this action is apparent from the face of the action itself -- *ie* that defendants actually simply believed plaintiff was not adequately enforcing the grooming policy. Here, plaintiff's circumstantial evidence might have been enough to survive summary judgment if that were the only justification. The officials who signed off on the recommended discipline received several of plaintiff's earlier complaints about the Mt. Pleasant fire, other internal memoranda accusing various superior officers with procedural violations, and blog posts, in some degree of temporal proximity to taking this adverse action. Pl. Br. at 45.

However, as with the First Amendment claim discussed above, plaintiff has also (unintentionally) provided a second, stronger independent reason for this action. Plaintiff asserts that this action was taken as a response to several communications that are not protected by the WPA, including plaintiff's report on the Mt. Pleasant fire, and several filings directed at chief Rubin, which raise internal procedural complaints about FEMS and plaintiff's dissatisfaction with her superiors. Pl. Br. at 45 (citing Pl. Ex. 19, 20, 22, 86 at 194). As discussed above, these communications are not "protected disclosures" under the WPA. Defendants elsewhere argue that several of its challenged personnel actions were taken with these communications in mind, that FEMS officials took these actions against plaintiff because of plaintiff's "erratic," "bizarre," "paranoid," and otherwise "worrisome" behavior. Defs. Br. at 5, 8, 10. Even plaintiff

acknowledges that "a supervisor could perhaps find that sending six memoranda to Chief Rubin in one day is out of the ordinary." Pl. Br. at 46

Thus, as with her First Amendment claim, plaintiff's over-broad pleading has inadvertently assisted her opponents in constructing a justification for actions that insulates them from WPA liability. Because plaintiff has conceded that defendants acted motivated by filings that are mostly unprotected, and has failed to provide anything more than a "scintilla" of evidence linking the protected disclosures to the challenged action (4), plaintiff's claim under this action must be dismissed.

Plaintiff's claims fail regarding actions (8), (9) and (10) for the same reason.[9] By alleging that a broad array of her communications spurred the defendants to take these actions against her, plaintiff inadvertently strengthen's defendant's own argument for why they took these actions: as a response to plaintiff's worrisome "out of the ordinary" behavior. See Pl. Br. at 29, 46-47. For the same reasons, the court grants defendant's motion for summary judgment on these claims.

Finally, actions (11), (12), and (13), are products of plaintiff's non-compliance with the command to undergo a fitness for duty evaluation. Because the initial command was itself not retaliatory, plaintiff cannot show these secondary actions were retaliatory without additional evidence. Having failed to produce such additional evidence, these claims must fail.

Thus, plaintiff fails to meet her burden on all of her WPA claims, and defendants' motion for summary judgment on this claim is granted.

## C.  Title VII + D.C. Human Rights Act – Retaliation

---

[9] For actions (5) (6) and (7), plaintiff has apparently decided not to press these complaints as she has not argued them in her summary judgment brief. Claims, if any, based on these actions under the WPA are considered abandoned.

Plaintiff alleges that she suffered eight materially adverse employment actions in retaliation for a variety of filings and communications in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000 et seq. and the D.C. HRA.[10]  For the reasons set forth below, defendants' motion for summary judgment on these claims will be granted.

**1.  Legal Standard**

Retaliation claims under Title VII are governed by a three-step test established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). A movant must display that 1) she was part of a protected class; 2) suffered a materially adverse action, and; 3) the adverse action is causally connected to the plaintiff's status within the protected class. Id. A materially adverse action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 57 (2006) (other internal quotation omitted). Examples of adverse employment actions include "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." Burlington Indus. v. Ellerth, 524 U.S. 742, 761 (1998).

"If the plaintiff [satisfies the McDonnell Douglas test], then the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for its action." Taylor v. Solis, 571 F.3d 1313, 1320 (D.C. Cir. 2009) (quoting Wiley v. Glassman, 511 F.3d 151, 155 (D.C. Cir. 2007)). "If the employer does so, then the court 'need not'-- and should not -- decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas." Id. (quoting Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original)). "The court should proceed to the question of retaliation vel non." Id. "The court can resolve that

---

[10] For purposes of this opinion, these two laws are analyzed the same way. See  Pl. Br. at 49 (citing Craig v. District of Columbia, 2012 WL 3126779 (D.D.C. Aug. 2, 2012)).

question in favor of the employer based either upon the employee's failure to rebut its explanation or upon the employee's failure to prove an element of her case." Id.

However, where an employer alleges that some of the alleged adverse actions plaintiff identifies are not sufficiently serious to support a retaliation claim, the court may first consider whether they are sufficiently adverse to constitute adverse employment actions. See Hayes v. Sebelius, 762 F. Supp. 2d 90, 99 (D.D.C. 2011).

Title VII "requires a plaintiff to exhaust his or her administrative remedies before a civil action may be filed in federal court." Robinson-Reeder v. Am. Council on Educ., 532 F. Supp. 2d 6, 12 (D.D.C.2008). The administrative charge requirement "should not be construed to place a heavy technical burden on 'individuals untrained in negotiating procedural labyrinths.'" Park v. Howard Univ., 71 F.3d 904, 907 (D.C. Cir. 1995) (quoting Cheek v. W. & S. Life Ins., Co., 31 F.3d 497, 500 (7th Cir.1994)). However, this requirement does demand some degree of specificity and is not a "mere technicality" since a court "cannot allow liberal interpretation of an administrative charge to permit a litigant to bypass the Title VII administrative process." Id. at 907. The exhaustion requirement means that "[t]he theories of discrimination in a plaintiff's lawsuit are limited to those theories contained in the EEOC Charge [she] filed." Marcelus v. Corrections Corp. of Am., 540 F. Supp. 2d 231, 236 (D.D.C. 2008). An important reason for this requirement is to "[give] the charged party notice of the claim." Park, 71 F.3d at 907 (citing Laffey v. Northwest Airlines Inc., 567 F.2d 429 (D.C. Cir. 1976)); see also Oliver v. Napolitano, 729 F. Supp. 2d 291, 298-99 (D.D.C. 2010).

### 2. Analysis

Plaintiff alleges that the department committed eight discrete actions in retaliation for plaintiff's Title VII protected activities:

(a) April 5, 2008, Citation by BFC John Lee for failure to check the basement during the Mount Pleasant fire.

(b) May 30, 2008 discipline for failure to check the basement.

(c) June 30, 2008 removal of ability to obtain case reference numbers necessary for tracking disciplinary matters initiated by plaintiff and subsequent July 2, 2008 removal of ability to cite superior officers.

(d) July 13, 2008 detail to the facilities maintenance division.

(e) July 21, 2008, order to attend EEO training.

(f) July 25, 2008 directive to undergo a fitness for duty evaluation which included a psychological examination.

(g) July 30, 2008, disciplinary charge for failure to timely charge a subordinate.

(h) July 31, 2008 placement on sick leave.

Pl. Br. at 50-51.

###    i.    Exhaustion

Defendants argue that plaintiff failed to exhaust her administrative remedies with respect to four of these eight named adverse actions – (1), (2), (7), and (8) -- and thus cannot proceed on these claims here. Defs. Br. at 53-54.  Defendants correctly state that plaintiff's February 20, 2009 EEOC charge does not mention actions (1), (2), (7) and (8).  Pl. Ex. 33.

However, plaintiff insists that she described these four missing events in earlier e-mails to the EEOC investigator. Pl. Br. at 51-53. Specifically, she points to an August 29, 2008 e-mail to the EEOC investigator in which she mentions number (1) and (2), Pl. Ex. 64, and, an August 1, 2008 e-mail in which she mentions (7) and (8). Pl. Ex. 33 at 6.

In the alternative, plaintiff suggests that even if the e-mails are not adequate to exhaust administrative remedies, the four actions left out of the charge should not be barred from a legal action because they would have been discovered within the scope of any investigation that reasonably could have been expected to result from the initial EEO charge. Pl. Br. at 52.

The court need not decide the exhaustion question, because even assuming plaintiff has exhausted her remedies, her claims would still fail on the merits, as discussed below.

ii.    **Plaintiff's Prima Facie Case**

Plaintiff is a member of two protected classes: a woman and an African-American. See Burlington, 548 U.S. at 57.  And, she suffered several materially adverse actions.[11]

However, most of plaintiff's numerous communications are not actionable under Title VII. Of all of the communications, statements and memoranda filed by plaintiff throughout 2007-2009, most of these cannot support a Title VII retaliation claim because they do not concern unlawful discrimination at her workplace. See  Broderick v. Donaldson, 437 F.3d 1226, 1232 (D.C. Cir. 2006) (holding that to constitute protected activity under Title VII, a complaint must "in some way allege unlawful discrimination").

Again, as a general matter, this opinion has divided plaintiff's various communications into seven general categories, listed above. Of these seven categories, only those under (4), (6) and (7) are actionable under a Title VII or D.C. HRA retaliation claim. All of the other memoranda are unrelated to unlawful discrimination and thus cannot support these claims.

**Category (1)** – plaintiff's assorted complaints and protestations regarding her role in the Mt. Pleasant fire, and its aftermath – do not allege race or sex-based discrimination and are not actionable.

---

[11] This opinion assumes, but does not decide, that all eight of the listed adverse actions qualify as materially adverse under Title VII. Cf. Defs. Br. at 61 (suggesting that number (3) is not materially adverse).

**Category (2)** – plaintiff's  complaints and memoranda about the fitness for duty evaluation – fail for the same reason.

**Category (3)** – plaintiff's citations of inferior and superior officers for a variety of performance and procedural offenses – fail for the same reason.

**Category (4)**  -- plaintiff's internal allegations of race and sex-discrimination – may support a Title VII retaliation claim.

**Category (5)** – plaintiff's TRO suit filed to prevent the enforcement of the fitness for duty evaluation – fails because it does not address unlawful discrimination.

**Category (6)** – plaintiff's assorted complaints to outside agencies and official bodies regarding unlawful discrimination may support a Title VII retaliation claim.

**Category (7)** – plaintiff's external statements to press and public about race and sex discrimination at FEMS may support a Title VII retaliation claim.

Thus, only plaintiff's communications in categories (4), (6), and (7) are actionable under Title VII. The rest of plaintiff's filings will not support a Title VII retaliation claim.

In her brief opposing defendant's motion for summary judgment, plaintiff lists ten communications that she argues are protected under Title VII.  Pl. Br. at 55-59:

1. Letter to Vincent Gray. (Undated, 2007) Pl. Ex. 1.

2. D.C. HRA Complaint. (March 21, 2007) Pl. Ex. 4.

3. EEOC Intake Questionnaire. (March 22, 2007) Pl. Ex. 6.

4. Blog and Media Interviews. (throughout 2008) Pl. Ex. 7.

5. Memo to Union Representatives. (March 27, 2008) Pl. Ex. 15.

6. E-mail to D.C. Council. (Undated, 2008) Pl. Ex. 25.

7. Memos to Chief Rubin. (June 20, 28 2008) Pl. Ex. 26, 27.

8.   Memos to Chief Rubin. (July 2, 2008) Pl. Ex. 28.

9.   Memo to Chief Rubin. (July 23, 25) Pl. Ex. 29, 30.

10. Discrimination Charge with Office of Human Rights. (February 20, 2009) Pl. Ex. 33.

Defendants challenge several of these communications, arguing that they do not genuinely raise issues about race or sex discrimination, or do so only in a shallow or conclusory fashion and are therefore not actionable under Title VII retaliation. However, this court need not address the minutiae of each individual statement, as plaintiff's claims fail for a broader reason.

### iii.    Defendant's Legitimate, Non-Retaliatory Reasons, and Plaintiff's Inability to Show Pretext

Assuming, arguendo, that plaintiff can state a prima facie case of Title VII retaliation based on the (in some cases quite extended) temporal proximity between the ten allegedly protected communications and the eight allegedly retaliatory actions, her claims nevertheless will fail because defendants have offered a legitimate non-retaliatory reason for taking these actions and plaintiff cannot show this reason to be mere pretext.

As discussed above, defendants claim that they acted in response to plainitff's erratic, paranoid, and otherwise worrisome behavior – as manifested in the "barrage" of dozens communications and memoranda which plaintiff documents in her filings in this case. These filings, as well as plaintiff's other behavior, gave the defendants legitimate concern about plaintiff's mental state, and her ability to safely command her company. While several of these filings (the ten or so listed above) do mention race and sex discrimination, the majority of them do not. Thus, defendants have a legitimate, non-Title VII retaliatory reason for taking each of the eight actions against defendant.

Plaintiff falls into the same trap under her Title VII claim as she did in her WPA and First Amendment Claims. By repeating and documenting her long trail of filings and memoranda, she has inadvertently provided documentary support for defendant's legitimate reason for taking action against her.

Moreover, this also makes it impossible for plaintiff to show "pretext" – by arguing that defendant's actions were retaliation for her entire body of filings, plaintiff cannot then turn around and show that the majority of these filings which did not concern race or sex discrimination had nothing to do with defendant's actions. Because defendants have offered a legitimate reason for the adverse actions taken, and because plaintiff cannot show this reason to be merely pretextual, this court grants defendants' motion for summary judgment with respect to the Title VII and D.C. HRA Retaliation claim.

### 3. Title VII + D.C. Human Rights Act – Hostile Workplace

Finally, plaintiff claims that defendant, the District of Columbia, created a hostile workplace in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq., and the D.C. HRA. Because plaintiff has failed to exhaust her administrative remedies, this claim also fails.

It is well-settled that a plaintiff cannot bring a lawsuit for discriminatory acts that are not alleged in the EEOC Charge of Discrimination. Park v. Howard University, 71 F.3d 904, 906 (D.C. Cir. 1995) (ruling that a Title VII plaintiff had not exhausted her administrative remedies because her administrative complaint did not contain the allegation of hostile work environment that appeared in the complaint before the court).

Here, the plaintiff's EEO charge contains no allegation of a hostile work environment and cannot be reasonably be read to contain a charge of hostile work environment. Defs. Ex. A-48;

Pl. Ex. 33. Instead, the charge describes two examples of "disparate treatment," and several exampels of "retaliation" for allegedly protected activities. <u>Id.</u> Because plaintiff has not exhausted her administrative remedies for a hostile work environment claim, the District is entitled to summary judgment on this claim.

**Conclusion**

For the foregoing reasons, defendant's motion for summary judgment is GRANTED.

A separate Order consistent with this opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on September 28, 2012.